Case number 22-71-11 Melchior H. George, appellant versus Molson Coors Beverage Company USA, LLC. Ms. Brown for the appellant, Mr. Reedy for the appellee. Good morning. Good morning. May it please the court, Carla Brown on behalf of Mr. George. Melchior George performed his job duties as a national account executive at Molson Coors so well that he earned their most coveted award from Buffalo Wild Wings, the Vendor of the Year Award. His career at Molson Coors spanned the length of 26 years since 1991, and he developed close personal relationships with the stakeholders at that account. Following his heart failure and heart transplant, Mr. George's doctors assigned him temporary travel restrictions. Molson Coors then deemed him unqualified for his job. Molson Coors then refused every accommodation suggestion that Mr. George made, refused to consider him for the positions that he suggested, and even refused to speak directly to him about how he could service the territories that he had worked in for eight years and earned the award. They also retaliated against him for taking medical leave and provided him a negative performance evaluation and terminated him. This is an appeal of the trial court's grant of summary judgment in favor of Molson Coors on behalf of Mr. George, and with respect to Mr. George's disability claims under the D.C. Human Rights Act and his FMLA claim, his FMLA retaliation claims. If I can address the discrimination claims first, Mr. George is asking this court to vacate the court's summary judgment order and remand this matter for trial. A reasonable jury could easily find, given Mr. George's longevity with Molson Coors, his cultivation of deep personal relationships with his customer base, that in his case, it was not essential for him to have to physically travel to all of his customers in order for him to continue to successfully perform his job duties during this time of the temporary travel restrictions, a period of months. Ms. Brown, so that might be reasonable in theory, right, that someone could have these meetings by Zoom or over the telephone for some period of time, but doesn't this court, I mean, don't our cases suggest that we need to defer to an employer's reasonable decisions about what is an essential function of the job? And here it seems that Molson Coors has, you know, had, you know, this kind of extensive travel as part of this job description for a long time, and it was always understood as an essential part of the job description. With respect to Mr., yes, Your Honor, that it was part of the job description, Mr. George stated that in his deposition, however, Mr. George also provided information that the stakeholders would frequently visit him in D.C. and that for just that period of months when he couldn't travel, he could continue to interact with some of them in D.C. He had certain territories he rarely traveled to and might have been unaffected during this period of months when he couldn't travel. In addition to that, he suggested the use of temporary commonplace electronic and online platforms as a reasonable accommodation to reach those territories, again, that he was so familiar with that he'd earned the coveted Vendor of the Year Award. So are you not disputing that travel, you know, travel farther than three hours from the essential part of the job? Yes, we're disputing that travel for a period of months could be removed in Mr. George's case and still allow him to successfully perform to relate to those customer bases, to continue to interact with key stakeholders. One of the items that most inquirers relied on is the need for Mr. George to build rapport in those territories. He didn't need to build a rapport any further. These were stakeholders who visited him as his home, who came to the D.C. area, people that he could continue to service just for a period of time on the online platforms, the ones that the court recognized in Solomon v. Vilsack, and a reasonable juror could easily find that those online platforms were sufficient, particularly given the time, particularly given now when online platforms are commonly used in a variety of areas. But the real issue is most inquirers never talked to him about how he would service those territories, which ones he needed to travel to, where the stakeholders were located, what was required in those territories, something he knew well. He had two individuals who supervised him, one while he was on medical leave having heart learning that he, with a heart failure, learning that he needed a heart transplant, and a second one who had shared the other half of the country that he did not share but who wasn't familiar with his territories at all. The interviewee was responsible for accommodations as well as the new supervisor that he had. Neither one of them even spoke to him about which territories he could service, how he would service those territories. They never suggested any positions to him that he could perform otherwise. In fact, they refused to even take his calls. Mr. George requested three separate meetings to talk about his territories, to talk about how he could return to work. And with each of those meetings, the meetings were canceled without explanation, no call and no effort to reschedule the meetings. Mr. George then rescheduled the meetings, again canceled. They were determined to deny his return. It was a fait accompli. There's a legitimate dispute about what Mr. George could do given who he was in these positions. Turning to the FMLA claims, Your Honor, the district, Your Honors, the district court recognized that Mr. Gick was the person who was named as Mr. George's supervisor during the periods that Mr. George was on medical leave. And the court even recognized that Mr. Gick expressed displeasure with Mr. George being out on leave. But the court found that Mr. Gick, quote, had not had a chance to bring his frustration to bear. The court improperly accepted Gick's statements that he was not involved in the termination over the contradictory statements of Molson Coors' own HR person who ran the accommodation process, who testified that she believed that she spoke to Gick about the ADA process, next steps, and, quote, moving forward with Mr. George's termination. The court did not credit the evidence that contradicted its factual. Other than temporal proximity, what other evidence is there that this was retaliation? The two emails from Mr. Gick, one in. That's the same with which there is temporal proximity, but what, is there any objective evidence that there's any connection between those two emails and the company's decision to terminate? Yes, Your Honor, looking at, looking at, with respect to the two emails, the significance is the content of those emails. One, in April 2019, where Mr. Gick expressed displeasure with Mr. George being out on FMLA leave, asking how long he could be out without having his position filled, and saying it was putting a strain on the team and impacting performance. Was anything false about any of those? Be that as it may, have you connected that up to the termination? I understand that temporal proximity can be a piece of evidence usually corroborating something else, but it can be a piece of evidence. But what else is there to connect those emails with the termination? Well, Your Honor, I think looking both at the temporal proximity and the content of the emails together, that shows the animus. That Mr. George, February 2019, is out on medical leave. One month later, he receives a very critical evaluation from his supervisors, who, neither one of whom really supervised him because he was in and out of medical leave for Mr. Gick. And with Ms. Winter, he wasn't there. You're saying he was unsupervised while he was on medical leave? No, I can't say that, Your Honor. That seemed to be what the argument was between the briefs. The argument is he had a supervisor who retired, and then Mr. Gick came in the picture. And once Mr. Gick, during that period of three months, really, Mr. George was in and out of medical leave. When Mr. Gick wrote his evaluation, he neither focused on his work that led to the Significant Vendor of the Year Award or even the award. One month after that, Mr. Gick openly expressed the displeasure in the email. And then in August of 2019, while Mr. George is still on leave, he's on leave during this with Mr. George in the context of him being on FMLA leave. The following month, Mr. George goes into the accommodations process where Molson Corp spends weeks denying him, rejecting him, refusing to speak to him with respect to the meetings he set up. And then roughly two months later, the day before Thanksgiving, he's terminated. I would just say the DC Human Rights Act and the Family Medical Leave Act are designed to protect employees like Mr. George who perform their jobs in an exceeding manner and just need a brief period of accommodation to continue to perform their jobs. So are you saying that summary judgment here is inappropriate because the accommodations process was a farce? Yes, in part, Your Honor. One, he could perform his job duties with an accommodation. No, I'm not talking about in part. All of your arguments to us today seem to say that the employers refuse anything he asked for, including meetings. Yet the way that part of the record I've looked reads is not quite that. He may not have gotten responses he wanted, but he conveys his ideas. And the company simply did not accept them and gave an objective reason as to how it defined this position he held. That's the way I understood what happened here. But today you're sort of arguing that he asked for meetings, they were canceled. He asked for consideration of certain things. There was no discussion about it, et cetera. I'm not sure if it's frozen. Yes, Your Honor, that's exactly what we're saying. That's what the record supports, that it wasn't that his considerations weren't discussed. Both Ms. Nellens and Ms. Winters testified that they never engaged in any conversation directly with him about the territories that he could work in or how he would service even the regional chain position that he suggested a demotion. I don't know if that answers Your Honor's question. And I see that I'm out of time, over time at this point. Judge Rogers, did you have a follow-up or? No, I may ask that later. Thank you. Okay, thank you. Good morning, Your Honors. May it please the Court. My name is Hans Reedy, representing Molson Coors, and I'm here with my colleague, Sarah Belger. The undisputed facts in this case, undisputed record evidence, establishes that travel was an essential function of George's job. George admitted in his deposition that 40 to 50 percent of this sales position centered around travel. The job description itself, that actual business record, is in the record evidence. It establishes that 60 percent in that posting. Jean Winter, who covered the eastern, or the western, I'm sorry, part of the United States in the same role with Mr. George covering the eastern part, covered for Mr. George when he was out for his illness and testified that she had to travel at least three weeks out of every month. Mr. George testified in his deposition that in-person interaction with brand and product at the restaurants, as you could imagine in this on-premise sales position, it took in-person interaction. And in addition to that, George stated in his deposition, testified in his deposition, and he gave us this reason also, and it's really well reflected in the record, particularly the ADA accommodation packet, which just shows the extent that Molson Coors went through in this back and forth. And there were emails back and forth, and there was a documented conversation, and there were other positions that were actually analyzed. Following Molson Coors' policy to a T, and it's significant detailed evidence that demonstrates that Molson Coors engaged in this interactive process in absolute good faith, and also per company policy, plaintiff argues that, appears to take issue with the fact that Mr. George wasn't always looped into all of this. Well, we had an HR specialist per policy corresponding with other individuals to determine the job requirements of these two alternate positions, and those were both determined also, and the form is in the record, that there could be no reasonable accommodation because they required travel, and they required in-person interaction and presentations. And Mr. George, as I said, his daughter was in school here. He could not, that was a self-imposed restriction that he had there that he wouldn't consider any other position outside the D.C. area. And also, the court, there was no temporal proximity to these two gig emails that are of 2000. The latest one was in August of 2019, and what Mr. Dick is trying to figure out there, there's no fill in that email. It says cover because he's, as a manager, he's trying to figure out how to cover the role, and that's all he is stating there, and then the termination does not occur, and it occurs after short-term disability. It's completely exhausted. It doesn't occur until November. Yeah, how long was it between the emails and the termination? It was September, October, November, three and a half months from the latest, the last email that Mr. Dick sent, and also Mr. Dick, there is no evidence that Mr. Dick was, it's uncontradicted in the record that Mr. Dick did not make the decision to terminate. He was spoken to during the process, but he did not make the decision, and the decision was made per company policy, and ultimately, there was no involvement from him in that, that ultimate decision, but he exhausted his short-term disability. He couldn't come back to work. He stated this, doctor's records, which were also relied upon in the packet, specifically say that he can't travel for more than 10 to 12 hours a week. Well, he brings up distributor positions, but he also acknowledges that if you work for a distributor, you're going to be driving all the time in a car, so that didn't work out. So, even if we accept that travel is an essential function of this job and the other jobs, I mean, what I understand Ms. Brown to be saying is that it wasn't essential that Mr. George be traveling for some limited period of time, that it wasn't essential that he had to be traveling at all moments of his job, and that he could have, for some short period of time while he was recovering, not traveled as extensively. I mean, what is your response to that argument? Because that's sort of what I understand Ms. Brown to be saying. My response to that argument is it's not supported whatsoever in the record. It's completely contradicted by the amount of evidence in the ADA packet and so forth, and there's analysis that goes into it. And for example, that travel is essential like at all moments of this job? Not at all moments, no, but in percentage, high percentages of it. I mean, it's an essential element. It's very competitive. There's record evidence of that, and that's what distinguishes it from any of these other cases that are cited. We're talking about outside sales person, and so you have, as Gene went to testify, Anheuser-Busch is at Buffalo Wild Wings. They're a huge customer too. We need to be there in person. Everybody acknowledges that. We look these other, sure, it's not 100%, but this is a strict requirement imposed, unfortunate, by Mr. George's, due to his unfortunate health condition, to his, by his doctor. Excuse me. Go ahead, Judge Rowe. Oh, no, I'm fine. Please continue. So basically, your position is, there is this job, here are the elements, end of discussion. And of course, the COVID period required all of us to make adjustments that we might not have otherwise made. And some experience developed in that regard was good. So I understand in person, but he was the head for this region. Were there no sort of deputies or assistants who could fill in the in-person travel for this period of time? No, there weren't. I mean, no. And we know that because? Well, the law that applies states that it's not an employer's obligation to kind of have, to have two people to fill one job. No, of course not. That's not the question. The point simply is that a lot of requirements that all of us assumed were part of our job had to be adjusted in due of circumstances beyond our control. So you could say, well, heart attack and recovery is not that. But it's not exactly, sorry for the double negative, not comparable either. It's one thing if he were going to be off, I don't know what a short period means here, but have deputies all over. And, you know, at the highest level, we've had vice presidents fill in for presidents historically. Now everybody wants to see the president, they want the president on the scene, but sometimes that's not always possible for whatever reason. And Coors is saying, and I agree with the inference from Judge that, you know, our laws, we don't define jobs for employers that the question is, has the appellate here met his burden to show, to overcome sort of that presumption that we accord to the employer's job definition. Yeah. Thank you, Judge. Rogers, would you like me to respond? I don't know if you're. Was there any evidence in the summary judgment seating that there was any such subordinate available to fill in for him? No, there was no evidence whatsoever. He's essentially an account manager who has to manage the account, right? Yes. And there is evidence that he raised in the interactive process, the alternate roles that he thought he could potentially do. And then in the ADA accommodation packet, this is where Wilson Coors absolutely met its interactive burden. It analyzed the points of and he raised two other positions and there are forms where Ms. Nellens conferred with Gene Winter who knew the details of the job and whether it could be, and it was said, no, there was no accommodation that could be had. One other point I wanted to raise here. No accommodation that could be made by the company as distinct from what the appellant could do on his own. Things like that. And the other positions were analyzed, including the one down to that would have required travel beyond three hours down to Virginia Beach, other alternate roles. And those were analyzed and based upon the canvassing of company individuals who knew the job requirements and the discussions and acknowledgments of Mr. George reflected in the record, he could not perform those jobs and couldn't be traveling. And what he kept saying was that he thought he would be of 2019. And so FMLA leave was exhausted. I mean, most employers went above and beyond what the FMLA and ADA required and kept him. And then he was ultimately approved for long-term disability. And that's in the record, which demonstrates he signed that he could not perform his job. That's why he was approved for long-term disability. And so, this is one where Molson Courts absolutely empathizes with the serious challenges that Mr. George faced. I could get more into record details and refute, for example, is the fact that his reviews were consistent. He had consistent and negative in some areas reviews. And that's all he had for constructive criticism. And that just addresses the retaliation argument, which is exceedingly tenuous. That's great. I see we're out of time. If my colleagues have any further questions? No, thank you. Okay. Thank you very much. Thank you. Ms. Brown will give you two minutes for rebuttal. Thank you very much. Your Honor, I would just ask the court to, if the court looks at the record, it's clear there was an absence. Ms. Nellens has notes of the accommodation process. There's an absence of even a single suggestion by the employer on how to accommodate Mr. George. ACCA versus Washington Hospital Center tells us that there's an onus on an employer to do something to participate with regard to the accommodations process, even to make suggestions on reassignments. But Molson Courts did none of that. It was all Mr. George suggesting different four positions in the area, including his own, that he tried to make accommodations within or suggested. Molson Courts' suggestion that Mr. George couldn't travel is an attempt to obfuscate that they were not willing to work with him on any jobs, not the four in the area that he certainly could have handled with accommodations, and none outside the country. They made no, or none anywhere else, no remote positions, nothing. They made no suggestions whatsoever. I'm sorry, Your Honor, I did not hear you. I would just note, again, as to the FMLA, the significance of that ADA process where the employer refused to do anything for him, refused to talk to him, refused to even pick up the phone. Mr. George pursued that accommodation process with the same tenacity that he pursued his job that led him to get the Vendor of the Year Award. Mr. Dick tells Ms. Nellens, come up with a better plan. One month later, she does. She puts him in this accommodation process where the employer does nothing but refuse him, refuse to talk to him. It's very significant that the employer never spoke to him about the territories. He was the only person at the company who knew how to service those territories and could do it well. They refused to talk to him, to pick up the phone on those three occasions that the accommodation or discussion was canceled. As to that, and for that reason, Your Honor, we're asking the court to vacate the court's summary judgment order. A jury could find that Mr. George, in his case, could perform his job duties, that the company refused to accommodate him or to consider his reasonable proposals like certain services on electronic means and that they retaliated against him. Thank you. Thank you, Ms. Brown. Case is submitted.
judges: Rao, Sentelle, Rogers